IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CLAUDIS LASSITER,<br><br>Defendant | CRIMINAL NO. ELH 17-0232 |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO
### DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

On August 14, 2018, this Court sentenced Petitioner, Claudis Lassiter, to 126 months in the custody of the Bureau of Prison (BOP), his second term of federal imprisonment for drug trafficking charges.[1] As part of his plea, the defendant admitted being a member of a drug conspiracy importing, processing, and distributing large quantities of cocaine, heroin, and fentanyl in Maryland. The quantity of drugs involved in the conspiracy required the Court to impose a 10 year minimum mandatory sentence, and the Court sentenced Petitioner above both that mandatory minimum and the bottom of his advisory guideline range.

Now, due to the coronavirus outbreak and his medical condition (hypertension), the defendant filed a pro se motion[2] seeking his compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A). Petitioner does not, however, appear to request a reduction in his sentence, but immediate release to serve his sentence on home confinement.[3]

---

[1] On November 28, 2007, the Honorable Andre M. Davis sentenced the defendant to 60 months in the BOP for conspiracy to distribute cocaine (AMD-06-0448).

[2] Undersigned counsel has been informed that the Office of the Federal Public Defender reviewed Petitioner's claim and will not be entering their appearance on his behalf.

[3] The Court does not have authority to order the BOP to allow the defendant to serve his sentence on home confinement. *See United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010); *See also United States v. Johnson*, Crim. No. JKB-14-0356, April 21, 2020, ECF 307, at 2 ("It is inherently the authority of the Bureau of Prisons to

1

Regardless, relief should be denied. First, Petitioner has not exhausted his administrative remedies within the BOP.[4] Second, he presents no "extraordinary or compelling" reason justifying his release. And finally, on balance the sentencing factors set forth in 18 U.S.C. § 3553(a) do not warrant a reduction in his sentence.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

The defendant entered into drug trafficking conspiracy. The Statement of Facts from his plea agreement noted that:

> Beginning at a time unknown, but at least as early as September 2016, the Defendant, Claudis Lassiter, co-defendant 1, and co-defendant 2, conspired with others to obtain and distribute one kilogram or more of heroin at a street-level drug "shop" in the area of Boarman Avenue and Reisterstown Road in Baltimore City, Maryland. During the period of the conspiracy, the Drug Enforcement Administration (DEA) obtained authority to intercept the communications of co-defendant 2. While intercepting co-defendant 2's cellular telephone, investigators heard co-defendant 2 coordinate shop operations with other members of his organization as well as with sources of supply. Additionally, investigators later intercepted a conversation between the Defendant and co-defendant 2. Through further investigation, it was determined that the Defendant was an alternate source of supply for co-defendant 2. Additionally investigators located an apartment where the Defendant, co-defendant 3, and co-defendant 4, stored and processed wholesale quantities of narcotics. Investigators were able to locate this apartment with use of a GPS tracking device on one of the Defendant's vehicle and subpoenaed information from [the] McHenry Row apartment complex…located at 1630 Whetstone Way, Apartment 521, Baltimore, MD 21230. On May 5, 2017, investigators installed two cameras within the Whetstone Apartment. From May 4th through May 13th, 2017, co-defendant 3 was captured on video processing narcotics inside the kitchen of the Whetstone Apartment on at least five occasions.
>
> On May 11, 2017, investigators observed co-defendant 3 process narcotics within the Whetstone Apartment, then leave, meet with co-defendant 5, and conduct a suspected a drug transaction in co-defendant 5's vehicle. Co-defendant 5 was stopped by investigators following this meeting and located in his vehicle were 30

---

transfer an inmate to home confinement, pursuant to 18 U.S.C. § 3624(c)"); *United States v. Carden,* 2020 WL 1873951 *(D. Md. Apr. 15, 2020); United States v. Brown*, 2020 WL 1479129. *(D. Md. Mar. 26, 2020).* The Court can, however, order home confinement as a condition of supervised release if the Court grants relief.

[4] Petitioner's motion indicates that he has exhausted his administrative remedies, and even the Federal Public Defender filed a letter with the Court noting that he has, see ECF # 479, but, according to BOP records, Petitioner has only requested and been denied release to home confinement, not compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

2

grams of heroin, which confirmed the drug transaction between co-defendant 5 and co-defendant 3. On May 13, 2017, co-defendant 3 brought a large suitcase into the Whetstone Apartment and then proceeded to process narcotics. When co-defendant 3 left the Whetstone Apartment, investigators arrested him and then searched the Whetstone Apartment. Investigators recovered from the apartment, approximately **one kilogram of fentanyl**, approximately **2990 grams of heroin**, over **two kilograms of cocaine**, [a] twenty-ton kilogram press, []other processing equipment and drug cutting agents.

On May 19, 2017, investigators executed search warrants at residences and a Honda Odyssey related to the Defendant and co-defendant 4. When investigators observed the Defendant walk towards the Honda Odyssey, they began to walk towards the Honda Odyssey as well and the Defendant jumped into the Honda Odyssey and quickly accelerated out of the spot. At the same time, [a DEA] Task Force Officer []was driving towards the area to assist other investigators. The Defendant then attempted to maneuver his car around [the] TFO's vehicle and flee the area. Other investigators in the area were able to stop the Defendant after he drove into a dead end street.

The Defendant agree[d] [as part of his plea] that it was reasonably foreseeable to him that members of the conspiracy would distribute **over ten kilograms** of heroin.

## II.   LEGAL FRAMEWORK FOR "COMPASSIONATE RELEASE"

The federal sentencing statute provides that an inmate cannot move for compassionate release unless he exhausts his administrative remedies with the BOP or by showing that the BOP failed to respond to his request within 30 days. Because Congress codified the exhaustion requirement, the Court can only dispense with this requirement if the inmate demonstrates that the administrative remedy is unavailable. Absent exhaustion or a showing of genuine unavailability, the Court does not have authority to adjudicate an inmate's motion for compassionate release. *See e.g.*, *United States v. Wiggins*, ELH-13-512, 2020 WL 2126882, at 2 (D. Md., May 5, 2020)(holding that exhaustion of remedies is a statutory requirement that may not be waived); *United States v. Johnson*, JKB-14-0356, (D. Md, April 21, 2020)(a defendant may only move for a reduction under § 3582(c)(1)(A) after he or she "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [after] the

lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier").

Once the inmate exhausts his administrative remedies and confers authority on the Court to rule on his motion, the Court can only reduce the inmate's sentence upon a showing of "extraordinary and compelling reasons" warranting the reduction; that the inmate is no longer a danger to the community; and that the reduction would be consistent with the relevant Sentencing Commission policy statement and the Section 3553(a) factors. 18 U.S.C. § 3582(c)(1)(A)(i) and U.S.S.G. § 1B1.13.

### A.  The Court's Authority to Adjudicate Motions for Compassionate Release

Under 18 U.S.C. § 3582(b), the district court has limited authority to modify a final sentence. *United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010); *Dillon v. United States*, 560 U.S. 817, 824-25 (2010) (noting that under Section 3582, the Court generally "may not modify a term of imprisonment once it has been imposed"); *United States v. Brown*, RDB-16-553, at 2 (D. Md. Mar. 26, 2020) (holding that the Court "may not modify the sentence imposed . . . unless certain limited circumstances arise or as permitted under Rule 35 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3582(c)").

### B.  Statutory Grounds for Compassionate Release

After exhaustion of administrative remedies, the statute establishes a two-step inquiry: First: the Court must determine if an inmate is eligible for a sentence reduction that is: (A) warranted by "extraordinary and compelling reasons"; and (B) consistent with applicable Sentencing Commission Policy Statements.  Second: if the Court finds the inmate is eligible for compassionate release, it must then consider whether a sentence reduction is warranted according to the factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A); *see also, Dillon*,

560 U.S. at 826-27 (holding that parallel language in Section 3582(c)(2) establishes a similar two-step inquiry)).

### 1. Eligibility for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) and U.S.S.G. § 1B1.13

The Sentencing Commission Policy Statement implementing 18 U.S.C. § 3582(c)(1)(A) states that the Court may reduce a term of imprisonment if it determines that, in relevant part, the requested reduction of the defendant's sentence meets each of three criteria:

> (1) extraordinary and compelling reasons warrant the reduction;
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

"[T]he Sentencing Commission is responsible for defining what should be considered extraordinary and compelling reasons for sentence reduction under § 3582(c)(1)(A)." *Hiller*, 2020 WL 2041673 at *3 (citing 28 U.S.C. § 994(t)) (further citation and internal quotation marks omitted).

> According to the Commission's Policy Statement, "extraordinary and compelling reasons" exist where
>
> > (A) the defendant is suffering from a terminal or serious medical condition;
> >
> > (B) the defendant is over 65 years old, has failing health, and has served at least ten years or 75 percent of his sentence, whichever is less;
> >
> > (C) the caregiver of the defendant's minor child dies or becomes incapacitated, or the defendant's spouse or partner becomes incapacitated and the defendant is the only available caregiver; or
> >
> > (D) "other reasons" as determined by the BOP.

*Id.* (citing U.S.S.G. § 1B1.13 cmt. n. 1(A)-(D)) (further citation and internal quotation marks omitted). "U.S.S.G. § 1B1.13 cmt. n. 1 (D) is referred to as the 'catch-all provision.'" *Id.* (citation omitted).

### 2. Consideration of the Section 3553(a) Sentencing Factors

Even for those inmates who are statutorily eligible for a reduced sentence, compassionate release is a "rare" and "extraordinary" remedy—even after expansion of the statute pursuant to the First Step Act. *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019) (holding that "a compassionate release . . . is an extraordinary and rare event."); *United States v. Mangarella*, 2020 WL 1291835, at *2-3 (W.D.N.C. Mar. 16, 2020).[5]

If the Court determines that the inmate is eligible for a sentencing reduction, the Court must then consider whether an exercise of its discretion to reduce the inmate's sentence is warranted according to the factors set forth in Section 3553(a) factors. *Dillon,* 560 U.S. at 827, 18 U.S.C. § 3582(c)(1)(A).

## III. THE BOP RESPONSE TO COVID-19

The BOP has taken aggressive action to mitigate the danger of COVID-19. In early 2020, the agency established a COVID-19 working group to develop responsive procedures in consultation with experts from the Centers for Disease Control ("CDC"). On April 13, 2020, the Bureau of Prisons implemented Phase Six of its Action Plan ("action plan") in order to minimize the risk of COVID-19 transmission into its facilities, extending prior mitigation measures, to

---

[5] To the extent an inmate simply asks the Court to modify the location of his sentence, that determination lies solely with the BOP. 18 U.S.C. §§ 3621(b) and 3624(c) (precluding judicial review of BOP placement decisions).

include enhanced modified operations for all institutions under May 18, 2020.[6] The action plan comprises several preventive and mitigation measures, including the following:

> **Screening of Inmates and Staff:** All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined, and symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. Staff registering a temperature of 100.4 degrees or higher will be barred from the facility on that basis alone.
>
> **Contractor Access:** Contractor access to BOP facilities is restricted to only those performing essential services (including medical or mental health care) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization from the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened using the same procedures as applied to staff prior to entry.
>
> **Quarantine Logistics:** The action plan directs all BOP institutions to assess their stockpiles of food, medicines, and sanitation supplies and to establish quarantine areas within their facilities to house any detainees who are found to be infected with or at heightened risk of being infected with coronavirus pursuant to the screening protocol.
>
> **Suspension of Social Visits and Tours:** BOP has placed a 30-day hold on all social visits, such as visits from friends and family, to limit the number of people entering the facility and interacting with detainees. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended for at least the first 30 days that the action plan is in effect.
>
> **Suspension of Legal Visits:** BOP has placed a 30-day hold on legal visits, though such visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.
>
> **Suspension of Inmate Movements:** BOP has also ceased the movement of inmates and detainees among its facilities for at least the first 30 days that the action plan is in effect. Though there will be exceptions for medical treatment and other exigencies, this will prevent transmissions between institutional populations. Likewise, all official staff travel has been cancelled, as has most staff training.

---

[6] The Bureau of Prisons has extended and enhanced its modified operations plans since the onset of the novel coronavirus pandemic, and the government expects these efforts will continue in subsequent phases of the action plan.

**Modified Operations:** Finally, the action plan requires wardens at BOP facilities to modify operations in order to maximize social distancing.[7]

On April 23, 2020, the BOP accounted that it had recently begun expanding COVID-19 testing of inmates utilizing the Abbott ID NOW instrument for Rapid RNA testing at select facilities experiencing widespread transmission.[8] The BOP will continue testing of symptomatic inmates, as recommended by the CDC, and rapid resting of newly symptomatic inmates will enable the Bureau to confirm diagnoses quickly and isolate inmates appropriately. The BOP is also expanding testing and appropriate medical isolation of asymptomatic inmates, in order to slow transmission within institutions.

The measures enumerated in the action plan, and the expansion of COVID-19 testing, are designed to sharply mitigate the risk of COVID-19 transmission into BOP facilities. As communicated to the government, BOP professionals will continue to monitor the path of the virus and adjust its practices as necessary to maintain the safety of BOP inmates. *Raia*, No. 20-1033, at 8 (Third Circuit taking note of the "BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread").

## IV. CONDITIONS AT FCI FORREST CITY MEDIUM

The Bureau of Prisons currently houses the defendant at FCI Allenwood Low, a Pennsylvania-based low security correctional institution with an adjacent medium security facility and a penitentiary. https://www.bop.gov/locations/institutions. As of June 18, 2020, FCI Allenwood Low housed 1,131 inmates, and reported **ZERO** active cases of COVID-19 among the inmates or staff. S*ee* https://www.bop.gov/coronavirus/.

---

[7] Further details are available at bop.gov/coronavirus/covid19_status.jsp, and at the regularly updated resource page, bop.gov/coronavirus/.

[8] Bureau of Prisons Expands COVID-19 Testing, April 23, 2020, available at https://www.bop.gov/resources/news/pdfs/20200423_press_release_covid19_testing.pdf.

In addition to the BOP's action plan, and expanded testing, the Department of Justice expanded eligibility for transfer to home confinement in an effort to allow appropriate inmates to serve their sentences at home during the pandemic.[9] As noted, Petitioner applied for and was denied release to home confinement.

## V.   THE DEFENDANT'S MOTION FOR RELEASE SHOULD BE DENIED

Before an inmate moves the district court for compassionate release, he must exhaust administrative remedies with the Bureau of Prisons ("BOP"). *See United States v. Underwood*, TDC-18-201 (D. Md. Apr. 10, 2020), ECF No. 185 at 3 ("[T]he Court finds no basis to waive the requirement."); *United States v. Johnson*, JKB-14-356 (D. Md. Apr. 21, 2020), ECF No. 307 at 2 ("…§ 3582(c)(1)(A) mandates that the defendant exhaust his or her administrative remedies prior to seeking relief in this Court."); *United States v. Mel*, 2020 WL 2041674, at *1 (D. Md. Apr. 28, 2020) (Chuang, J.); *United States v. Maycock*, GLR-14-133 (D. Md. May 12, 2020), ECF No. 69 at 2 ("[T]he Court may not consider a request for a sentence reduction unless the prisoner has exhausted administrative remedies . . . or by waiting for a period of thirty days following the Warden's receipt of the request."). *See also United States v. Raia*, No. 20-1033, at 7 (3d Cir. 2020) (failing to exhaust administrative remedies under Section 3582 "presents a glaring roadblock foreclosing compassionate release"). This means that the inmate must show that the BOP already denied his request for compassionate release or that the BOP failed to respond to his request within 30 days. The burden is on the inmate to demonstrate that he has exhausted administrative remedies and that there are extraordinary and compelling reasons to reduce her sentence. 18 U.S.C.

---

[9] Given the surge in positive cases at select sites and in response to the Attorney General directives, the BOP began immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, to determine which inmates were suitable for home confinement.  Between March 26, 2020 (the date of the Attorney General's original memo) and June 16, 2020, BOP placed an additional 4234 inmates on home confinement; an increase of 148%.  *See* https://www.bop.gov/coronavirus/index.jsp

§ 3582(c)(1)(A); *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that an inmate, "as the § 3582(c)(2) movant, bears the burden of establishing" eligibility).

According to BOP records, as of June 18, 2020, Petitioner has not filed for a reduction in sentence (RIS) nor has he been prevented from seeking relief within BOP. While Petitioner has requested and been denied release to home conferment, he has not requested compassionate release. As a result, Petitioner has not exhausted his administrative remedies, and this Court lacks authority to consider his motion. *See* 18 U.S.C. § 3582(c)(1)(A).

### A.     Even if the Defendant Exhausted Administrative Remedies, He is Not Entitled to Compassionate Release

Moreover, even if the Court determined that Petitioner exhausted his administrative remedies through his request for release to home confinement, fear of contracting the novel coronavirus while incarcerated is not sufficient reason for granting compassionate release. *See Hiller*, 2020 WL 2041673 at *4. "Simply put, the coronavirus is not tantamount to a 'get out of jail free' card." *Id.* (internal citations and quotation marks omitted). A defendant is only eligible for a reduction in his sentence under 18 U.S.C. § 3582(c)(1)(A) if: (1) extraordinary and compelling reasons warrant the reduction; (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and (3) the reduction is consistent with the Sentencing Commission's Policy Statement. U.S.S.G. § 1B1.13.

#### 1.     Defendant does not identify any "extraordinary and compelling reason" making him eligible for release

The defendant is not terminally ill, not over 65 years of age, nor suffering from a "serious physical or medical condition. Application Note 1(A)(ii)(I) to U.S.S.G. § 1B1.13 defines "a serious physical or medical condition [as one]… that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he

10

or she is not expected to recover." Recently, the Department of Justice indicated, that at least during the pandemic, an inmate who presents one of the CDC risk factors, as confirmed by medical records, and who is not expected to recover from that condition, presents an "extraordinary and compelling reason" allowing compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release.

The defendant asserts that his "hypertension," which had been confirmed through his medical records, represents the "extraordinary and compelling reason" justifying his release. Despite Petitioner's claim, the CDC does not list hypertension as a risk factor. In fact, the CDC in the Frequently Asked Question section of their website, specifically indicates that hypertension and high blood pressure are not risk factors.[10] As a result, the defendant does not present an "extraordinary and compelling circumstance," even under BOP relaxed standards, entitling him to compassionate release.

Petitioner points to *United States v. Sawicz*, WL1815851, a case from the Eastern District of New York, where a judge found hypertension to be the extraordinary and compelling reason justifying compassionate release. Petitioner's case, however, differs from *Sawicz* in many aspects. First, *Sawicz* was decided at the earliest stages of the pandemic. Second, the *Sawicz* court acknowledged that hypertension, "d[id] not place [Sawicz] squarely within any of the Policy statement's definitions of 'extraordinary and compelling reasons,'" *Id,* but, unlike here, the Government did not challenge the assertion that hypertension was an extraordinary or compelling

---

[10] At this time, [the CDC] do[es] not think that people with high blood pressure and no other underlying health conditions are more likely than others to get severely ill from COVID-19. Although many people who have gotten severely ill from COVID-19 have high blood pressure, they are often older or have other medical conditions like obesity, diabetes, and serious heart conditions that place them at higher risk of severe illness from COVID-19. *See* www.cdc.gov › coronavirus › 2019-ncov › faq  (6/18/20)

reason justifying release. Third, the inmate was serving his sentence at FCI Danbury, where a COVID-19 outbreak had occurred.[11] Fourth, the court waived the administrative exhaustion requirement, mainly because fifth, Sawicz had only a very short time remaining on his sentence. At the time of the filing of his motion, Sawicz was already being processed for placement in a halfway house. The Court reasoned that forcing him to wait 30 days to exhaust the administrative requirement, while serving his sentence in an institution where an outbreak had occurred, "would put him at significant risk of suffering catastrophic health consequences." *Id.* Aside from a similar diagnosis, none of these factors apply to Petitioner's case.

### 2. Defendant's Dangerousness to the Community under 18 U.S.C. § 3142(g)

Even if the Court, like in *Sawicz*, determined that Petitioner's hypertension established an extraordinary or compelling reason justifying release, the Court must address the defendant's dangerousness to community using the factors set forth in 18 U.S.C. § 3142(g) (the provision governing pre-trial release). Here, the defendant's count of conviction, if charged today, would afford the Government the rebuttal presumption of the defendant's detention pending trial, s*ee* 18 U.S.C. § 3142(e)(3)(A), and countless courts have identified drug trafficking as an inherently dangerous crime. In this particular case, Petitioner imported and sold vast quantities of dangerous drugs including fentanyl and carfentanyl, and while not necessarily directly traceable to this defendant, those drugs cause several overdose deaths during the period of the conspiracy.

The defendant poses the same danger to the community as all recidivist drug traffickers. Given the ongoing carnage in Baltimore City (even during the pandemic), caused principally by feuds over drug territory, the Court should look closely at the defendant's criminal record, which

---

[11] As of June 17, 2020, FCI Danbury had six inmates and one staff member positive for the virus

includes a prior federal drug conviction, and his behavior while in BOP, which includes during his first period of confinement an administrative finding for assault, before recommending release. In short, the Government believes the defendant, a two-time federally convicted drug trafficker, remains a danger to the community.

### B. On Balance the 3553(a) Factors Do Not Justify Release

Even if the defendant exhausted his administrative remedies (which he has not), or identified an extraordinary or compelling reason making him eligible for release (which he does not), and the Court determined that the defendant was not a danger to the community (which it cannot), the defendant's motion should still be denied after consideration of the factors set forth in 18 U.S.C. § 3553(a).

First, the defendant is a recidivist drug trafficker, who has spent considerable time in federal prison. His instant convictions involves the wholesale importation of vast quantities of drugs into Maryland which led to confirmed overdose deaths and immeasurable misery in the community. This Court sentenced him above both his mandatory minimum sentence and the bottom of his guideline range. Petitioner has served less than one-third of his second federal sentence.

Second, during his confinement for his first conviction, the defendant accrued several administrative infractions. Most notably, BOP assessed administrative penalties against the defendant for disruptive behavior and assault (See Ex. 1). Given the COVID-19 limitation placed on direct supervision of inmates on supervised release, the Court needs assurances that defendants will follow rules and obey their case agents. His initial poor adjustment in BOP coupled with his second federal conviction upon release does not inspire confidence that the defendant will comply with supervision.

13

Finally and most importantly, the defendant possess no extraordinary or compelling reason justifying his release. Coronavirus itself is being handled well within the BOP and FCI Allenwood Low in particular. FCI Allenwood Low reports **ZERO** cases of COVID-19. Petitioner's fear of contracting the virus is insufficient to justify his release, and aside from his own self-serving statements, Petitioner offers no other basis for his compassionate release.

## VI. CONCLUSION

The Government respectfully requests that the defendant's motion for a compassionate release be denied.[12]

                    Respectfully submitted.

                    Robert K. Hur
                    United States Attorney

                    James T. Wallner
                    Assistant United States Attorney

### CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2020, a copy of the foregoing motion in opposition was mailed postage paid to:

Claudis Lassiter (42543-037)
LSCI Allenwood
P.O. Box 1000
White Dear, PA  17887

                    James T. Wallner
                    Assistant United States Attorney

---

[12] Should the Court grant relief, the Government requests that the Court order that the inmate be held in quarantine for 14 days prior to release to insure that BOP is not releasing an already infected person into the community.